––––––––––O––––––––––

No. 6961.

## JAKE BAZILE v. FREEPORT & TAMPICO FUEL OIL CORPORATION.

### Syllabus.

Plaintiff sustains the burden of proof when he shows that at the time his plants were destroyed the defendant's adjoining factory was emitting noxious gases destructive of plant life, and that there was no other known agency of destruction at the time.

Appeal from the 29th Judicial District Court, Parish of St. Bernard, No. 1029, Honorable R. Emmet Hingle, Judge. Amended and affirmed.

L. Fred Andry, for plaintiff and appellee.

Farrar, Goldberg & Dufour, for defendant and appellant.

His Honor, CHARLES F. CLAIBORNE, rendered the opinion and decree of the Court, as follows:

This is a suit for damages alleged to have been done to vegetables on plaintiff's property by noxious and pernicious gases emitted from defendant's plant.

Plaintiff avers that he is engaged in the cultivation of vegetables on his lands which adjoin the upper line of defendant's property; that the defendant has a set of boilers in which oil is put and heated for the manufacture of different oils and greases; that this oil, when heated, emits gases or fumes; that during the week commencing on the 24th and ending on the 29th of January, 1916, the defendant corporation operated this set of boilers; that the gases which were generated from these boilers were blown over petitioner's fields and completely destroyed five hundred barrels of "endive salad" of the value of $2 a barrel.

Defenant denied that the fumes emitted from its boilers injured plaintiff's plants.

There was judgment in favor of plaintiff for $800, and defendant has appealed.

Plaintiff has answered the appeal by asking that the judgment be increased to $1,000.00.

Plaintiff is entitled to judgment if he establishes his allegations. *Wichere v. N. O. Acid Co.*, 128 *La.*, 1011.

The plaintiff testifies that the gases from defendant's plant killed his crop of endives; that there was neither frost nor freeze that week; but the fumes came down and rotted the vegetables; a freeze does not kill endives, unless it is "mighty strong"; nothing could kill it except this gas, because it can stand a heap of cold; he went over to the

255

defendant and told one of the officers of his loss; and they told him to see what the damage was and to come back; he never went back, but saw his lawyer.

Emile Casetta, brother-in-law to plaintiff, cultivates a place three hunred feet from him; he says the fumes from the old still destroyed plaintiff's endives; he was a sure of it as that he was sitting here; he had some parsley burned, too; he doesn't know what is in those fumes but they are like smoke, and he knows what that smoke does; there was no freeze at that time, it was fair weather.

Charles Serpas is a Deputy Sheriff; he has lived near there for ten years, and has been truck-farming all his life; plaintiff called on him to step over to his place that he might show him what that smoke and gas were doing him; he saw that the endive was burned and scorched while a hundred and fifty feet away the other was green; there was neither frost nor snow at that time that could spoil it like that; the defendant is not using the same stills in front any more; it has moved them to the rear, and put on higher stacks.

The defendant introduced Dr. H. M. Shilstone. He is a chemist of sixteen years' experience. He drew samples of the gas from defendant's smokestacks in April and analyzed them on the ground; he found carbon dioxide, oxigen, and sulphur dioxide which is a gas formed by combustion of sulphur contents present in crude oil; the quantity of this gas emitted was .0312 per cent., equal to 2.5 tons during a whole day; the other gases are not deleterious at all to vegetable life; the United States Government appointed a commission, composed of chemists, agriculturists, botanists, veterinary surgeons, and others, to determine whether the gases emitted by the Shelby Smelt-

256

ing and Lead Company, of Solana County, California, were injuious to vegetable life; these gases consisted of sulphur dioxide similar in part to those emitted from burning oil; the conclusion reached by this commission was that as long as the total output of sulphur dioxide was less than eighty tons per day the smelter would not affect vegetation injuriously. The report is printed in a review entitled, "Chemical Abstracts", Vol. 10, No. 4, February 20, 1916, pp. 446, 451, 488, filed in evidence in this case.

The defendant also introduced in evidence the meteorological report of the Weather Bureau for the United States for the months of December, 1915, and January, 1916. This report shows that the temperature underwent the following variations during January: On the 13th, 38 to 49 degrees; on the 14th, 33 to 52 degrees; on the 15th, 38 to 63; on the 17th, 33 to 46; on the 18th, 33 to 41; on the 19th, 35 to 56, and thereafter the lowest temperature was 50 and the highest 79.

We must take judicial cognizance of the fact that 32 degrees is freezing point, and that therefore there was no freeze during the month of January. Although the weather was cold and near freezing, we are bound to consider that it did no harm to plaintiff's plants, as the testimony of himself and of his witnesses is uncontradicted that it requires a hard freeze to injure endives, and that there was no cold at that time to injure them.

But plaintiff's endives were suddenly destroyed about that time. Plaintiff and his witnesses swear that the gases emitted from defendant's boilers did it. We are bound to believe them, as no other cause is assigned or suggested by defendant or the testimony. But defendant's expert chemist tells us that the fumes from its plant are

not deleterious. Notwithstanding all the respect we entertain for him and the report of the Shelby Smelting Company Commission, their authority must yield to the more persuasive testimony of actual facts and the drooping endives. The same line of expert testimony was introduced in *Wicher's case,* but the Supreme Court felt bound to yield to the evidence of facts. The plaintiff's witnesses did not know the technical names of the gases which were formed in the fumes emanating from the plant, but they knew they were blighting.

The suit of *McCubbin v. Hastings,* 27 *An.,* 713, was an action against a druggist for having filled a prescription for an enema with spirits of camphor or camphorated alcohol instead of camphor water, and having thrown the unfortunate patient into spasms and convulsions which caused much pain and ceased only upon her death. The Court said, on p. 717:

> "The last serious defense set up is, that the enema did the patient no harm. Many physicians were examined upon this point, and counsel for defendant, in the very able brief which he furnished, says:
> "With surprising unanimity, these physicians, every one of whom have had large experience in the treatment of yellow fever, declared the effect would have been beneficial rather than injurious (p. 718). When scientific gentlemen undertake to tell us, under such a state of facts, that the enema, as administered, was a benefit to the patient instead of an injury; that a substance as powerful as alcohol, in which camphor, a violent stimulant, has been dissolved, can be injected into one of the tenderest parts of the human frame, when the patient is suffering from a severe attack of such a disease as yellow fever is, without doing any harm, but, on the contrary, doing good, we see in our mind's eye

the unfortunte victim upon whom the experiment has been tried, as she is described by the witnesses, writhing in agony—dying—dead—and we say that that dreadful fact alone destroys all their theories."

In *2nd Wharton Cr. Ev.* by Hilton, (*10th Ed.*) *No.* 563, it is said:

"The personal factor in all expert testimony is far more evident than it is in the testimony of those witnesses who testify to facts that are matters of common knowledge and common observation."

We have then to consider what quantity of endive was destroyed and what was its value. Upon this point plaintiff is his only witness. His testimony in support of his claim is contained in the following questions and answers:

Q. In this petition, we allege that the Freeport and Tampico Fuel Oil Corporation, during the week beginning Monday, January 24th, 1916, and continuing to Saturday, January 29th, 1916, that they emitted gases from their plant, their refinery, which killed your crop of endives.

A. Yes, sir.

Q. We allege that it destroyed 500 barrels of this stock?

A. Yes, sir.

Q. Will you tell us, is that correct?

A. Yes, sir.

Q. How many barrels—we allege 500 barrels, is that correct?

A. I never figured on it, it may have been more.

Q. And in this petition you say the salad was worth two dollars a barrel, is that correct?

A. Yes, sir.

Q. Making a thousand dollars?

A. Yes, sir.

On cross-examination he testified that the land cultivated by him "might have been about five acres";

that he cultivated the front part of his property from his house to the railroad, a distance of about six acres, divided into two patches; in each patch were fourteen beds; each bed was four feet wide; all his endives were destroyed, so that he could not use "one bush of it"; he subsequently modifies this statement by admitting that, prior to its destruction by the fumes, he cut "seventy-five or a hundred barrels" which he sold at two dollars a barrel; endive is planted broadcast about the end of August and takes "a month, two months, according to the ground" to mature; he does not know at what part of the year he cut the endive that he sold; he first said in February; but when asked again if it was in February he answers: "Yes—no, I done got mixed—I can't think about when I cut that; I don't recollect that."

When we bear in mind that plaintiff must make out his case with some degree of certainty, we feel that he has not met these requirements of law to entitle him to the amount claimed by him or allowed by the judgment.

When plaintiff testifies that he cultivated five acres in endives, on which he lost five hundred barrels, it is evident he calculates one hundred barrels to the acre. But is it true that he had five acres under cultivation? According to his own testimony, the amount of land cultivated by him extended from his house to the railroad, a distance of six acres, divided into two patches of three acres each; each patch contained fourteen beds, each four feet wide; so that, in our estimation, plaintiff's patches of endives measured fifty-six feet front by six acres deep; or in all about one acre and a half. On plaintiff's testimony this acre and a half would have yielded him one hundred and fifty barrels, worth three hundred dollars, which is the

only amount which we think he has made reasonably certain.

The judgment is therefore reduced from eight hundred to three hundred dollars, and as thus amended it is affirmed, the costs of appeal to be paid by the plaintiff.

Opinion and decree, March 19th, 1917.

Rehearing refused, April 16, 1917.

Writ denied, June 13, 1917.